UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
INDIANAPOLIS DIVISION

| | |
|---|---|
| CHELSIE E.[1], | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | )   No. 1:23-cv-00455-RLY-KMB |
| | ) |
| KILOLO KIJAKAZI, | ) |
| | ) |
| Defendant. | ) |

**REPORT AND RECOMMENDATION ON COMPLAINT FOR JUDICIAL REVIEW**

Plaintiff Chelsie E. applied for disability insurance benefits from the Social Security Administration ("SSA") in November 2020, alleging an onset date of October 9, 2020. [Dkt. 8-3 at 2.] Administrative Law Judge Lawrence E. Blatnik (the "ALJ") conducted a hearing on June 30, 2022. [Dkt. 8-2 at 41-74.] The ALJ issued a decision on August 17, 2022, concluding that Chelsie was not entitled to receive disability insurance benefits. [*Id.* at 11-26.] The Appeals Council denied Chelsie's request for review on January 30, 2023. [*Id.* at 2-4.] This matter was referred to the Magistrate Judge under 28 U.S.C. § 636(b)(1)(B) and Fed. R. Civ. P. 72(b) for a Report and Recommendation as to the appropriate disposition of the pending motion.

**I.  STANDARD OF REVIEW**

"The Social Security Administration (SSA) provides benefits to individuals who cannot obtain work because of a physical or mental disability." *Biestek v. Berryhill*, 139 S. Ct. 1148, 1151 (2019). Disability is the inability "to engage in any substantial gainful activity by reason of any

---

[1] To protect the privacy interests of claimants for Social Security benefits, and consistent with the recommendation of the Court Administration and Case Management Committee of the Administrative Office of the United States Courts, the Southern District of Indiana has opted to use only the first names and last initials of non-governmental parties in its Social Security judicial review opinions.

medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than twelve months." *Stephens v. Berryhill*, 888 F.3d 323, 327 (7th Cir. 2018) (citing 42 U.S.C. § 423(d)(1)(A)).

When an applicant appeals an adverse benefits decision, this Court's role is limited to ensuring that the ALJ applied the correct legal standards and that substantial evidence exists for the ALJ's decision. *Stephens*, 888 F.3d at 327. "[S]ubstantial evidence" is "evidence that 'a reasonable mind might accept as adequate to support a conclusion.'" *Zoch v. Saul*, 981 F.3d 597, 601 (7th Cir. 2020) (quoting *Biestek*, 139 S. Ct. at 1154). "Although this Court reviews the record as a whole, it cannot substitute its own judgment for that of the SSA by reevaluating the facts, or reweighing the evidence to decide whether a claimant is in fact disabled." *Stephens*, 888 F.3d at 327. Reviewing courts also "do not decide questions of credibility, deferring instead to the ALJ's conclusions unless 'patently wrong.'" *Zoch*, 981 F.3d at 601 (quoting *Summers v. Berryhill*, 864 F.3d 523, 528 (7th Cir. 2017)). "[E]ven under deferential standard of review for social security disability cases, an [ALJ] must provide a logical bridge between the evidence and [the] conclusions." *Jarnutowski v. Kijakazi*, 48 F.4th 769, 773 (7th Cir. 2022) (internal quotations omitted).

The SSA applies a five-step evaluation to determine whether the claimant is disabled. *Stephens*, 888 F.3d at 327 (citing 20 C.F.R. § 404.1520(a)(4); 20 C.F.R. § 416.920(a)(4)). The ALJ must evaluate the following, in sequence:

> (1) whether the claimant is currently [un]employed; (2) whether the claimant has a severe impairment; (3) whether the claimant's impairment meets or equals one of the impairments listed by the [Commissioner]; (4) whether the claimant can perform her past work; and (5) whether the claimant is capable of performing work in the national economy.

*Clifford v. Apfel*, 227 F.3d 863, 868 (7th Cir. 2000), *as amended* (Dec. 13, 2000) (citations omitted).  "If a claimant satisfies steps one, two, and three, she will automatically be found disabled.  If a claimant satisfies steps one and two, but not three, then she must satisfy step four.  Once step four is satisfied, the burden shifts to the SSA to establish that the claimant is capable of performing work in the national economy."  *Knight v. Chater*, 55 F.3d 309, 313 (7th Cir. 1995).

After Step Three, but before Step Four, the ALJ must determine a claimant's residual functional capacity ("RFC") by evaluating "all limitations that arise from medically determinable impairments, even those that are not severe."  *Villano v. Astrue*, 556 F.3d 558, 563 (7th Cir. 2009).  In doing so, the ALJ "may not dismiss a line of evidence contrary to the ruling."  *Id*.  The ALJ uses the RFC at Step Four to determine whether the claimant can perform his own past relevant work and if not, at Step Five to determine whether the claimant can perform other work.  *See* 20 C.F.R. § 404.1520(a)(4)(iv), (v).

If the ALJ committed no legal error and substantial evidence exists to support the ALJ's decision, the Court must affirm the denial of benefits.  *Stephens*, 888 F.3d at 327.  When an ALJ's decision does not apply the correct legal standard, a remand for further proceedings is usually the appropriate remedy.  *Karr v. Saul*, 989 F.3d 508, 513 (7th Cir. 2021).  Typically, a remand is also appropriate when the decision is not supported by substantial evidence.  *Briscoe ex rel. Taylor v. Barnhart*, 425 F.3d 345, 355 (7th Cir. 2005).

## II.  RELEVANT BACKGROUND

Chelsie was 27 years old when she applied for disability insurance benefits.  [Dkt. 8-3 at 2.]  She has an associate degree and previously worked as an office clerk.  [Dkt. 8-2 at 49-51.][2]

---

[2] The relevant evidence is set forth in the Parties' briefs and need not be repeated here.  Specific facts relevant to the Court's disposition of this case are discussed below.

The ALJ followed the five-step evaluation set forth by the SSA in 20 C.F.R. § 404.1520(a)(4) and concluded that Chelsie was not disabled. [*Id.* at 26.] Specifically, the ALJ found as follows:

- At Step One, Chelsie had not engaged in substantial gainful activity[3] since October 9, 2020, the alleged onset date. [*Id.* at 13.]

- At Step Two, Chelsie had the following severe impairments: migraine headaches, Chiari malformation, obesity, a bipolar disorder, an anxiety disorder, and post-traumatic stress disorder. [*Id.* at 13-14]

- At Step Three, Chelsie did not have an impairment or combination of impairments that met or medically equaled the severity of one of the listed impairments. [*Id.* at 14-16.]

- After Step Three but before Step Four, Chelsie had the RFC "to perform a full range of work at all exertional levels but with the following nonexertional limitations: She is limited to only occasional exposure to extreme heat or humidity; must avoid concentrated exposure to fumes, odors, dusts, gases and pulmonary irritants; and is limited to moderate levels of noise. She can perform simple, routine and detailed, but not complex, tasks, and can manage the stresses involved with detailed tasks. She can relate on a superficial and ongoing basis with supervisors and co-workers, manage occasional contact with the public, but should avoid sustained, intensive, interpersonal contact with the public." [*Id.* at 16]

- At Step Four, relying on the testimony of the vocational expert ("VE") and considering Chelsie's RFC, Chelsie was "capable of performing past relevant work as an office clerk." [*Id.* at 24.]

- Proceeding to Step Five, relying on VE testimony and considering Chelsie's age, education, and RFC, there were jobs that existed in significant numbers in the national economy that Chelsie could have performed through the date of the decision, such as order picker, and automobile detailer. [*Id.* at 25.]

### III. DISCUSSION

Chelsie claims that the ALJ erred in three ways: (1) that his reasoning to discredit Chelsie's testimony was erroneous and rife with factual errors, improper assumptions, and speculation; (2) that he failed to properly analyze whether Chelsie's migraines meet the requirements of Listing

---

[3] Substantial gainful activity is defined as work activity that is both substantial (*i.e.*, involves significant physical or mental activities) and gainful (*i.e.*, work that is usually done for pay or profit, whether or not a profit is realized). 20 C.F.R. § 404.1572(a).

4

11.02 (epilepsy) and failed to use readily available expertise as mandated by Social Security Rules; and (3) that in conducting an RFC analysis and posing a hypothetical question to the Vocational Expert, he failed to account for reasonable limitations associated with Chelsie's migraines that were supported by her medical records. [Dkt. 10 at 4.] The Court will address the issues as necessary to resolve the appeal, beginning with the first issue because the Court finds it to be dispositive.

### A. The ALJ's analysis in discrediting Chelsie's testimony was improper.

Chelsie argues that the ALJ failed to build a logical bridge between the medical evidence and his finding that her testimony about the frequency, severity, and limiting effects of her migraines was not credible. [Dkt. 10 at 19-29.] She argues that the ALJ improperly considered the fact that she was still working in July 2020, which was three months before her onset date, as evidence that her symptoms were not as bad as she alleged. [*Id.* at 20.] She argues that the ALJ misconstrued a note in her medical records that her medication compliance was "76-100%" as evidence that her worsening symptoms were caused by non-compliance with prescribed treatment. [*Id.* at 21.] Chelsie argues that the ALJ improperly found that her decision to decline counseling in December 2020 undermined her testimony about the efficacy of her prescribed treatment, since that counseling was offered for unrelated mood disorders, and the ALJ did not ask her to explain her reasons for declining counseling. [*Id.* at 22.] She argues that the ALJ mischaracterized notes in her medical records as indicating that medication significantly alleviated her symptoms, when in fact the medical records showed that, consistent with her testimony, she had several moderate to severe migraines every week during the time she was allegedly disabled "with no notable changes in her migraine frequency." [*Id.* at 23.] Finally, Chelsie argues that the ALJ improperly found that a recent CT scan contradicted her testimony about the frequency and severity of her

migraines, when there was no medical evidence or expert opinion evidence that the frequency and severity of migraines can be assessed through this type of imaging. [*Id.* at 24-25.]

In response, the Commissioner argues that the Court must defer to the ALJ's credibility determinations and that none of Chelsie's arguments supports a finding of reversible error. [Dkt. 13 at 17-19.] The Commissioner concedes that the ALJ considered the fact that Chelsie was working in July 2020 but argues that this was "just three months before her alleged October 2020 onset date." [*Id.* at 17.] As to the ALJ's finding that Chelsie was non-compliant with her medication, the Commissioner argues that Chelsie "took herself off medications at times when she felt that they had lost efficacy." [*Id.* (citing dkt. 8-2 at 19) ("The claimant had also previously stopped taking her migraine injections (Emgality, Botox) due to reported loss of efficacy, and reported that Sumatriptan and Tylenol only partially helped to abort her migraines.").] As to Chelsie's decision to decline counseling in December 2020, the Commissioner argues that the ALJ "simply indicated that Plaintiff believed that Cymbalta was sufficient to treat her mental impairments and that it had been effective at treating her headaches at the time." [Dkt. 13 at 17-18.] The Commissioner argues that the ALJ's finding that prescribed medications and treatments effectively managed Chelsie's migraines "reasonably considered Plaintiff's conservative treatment history and committed no error in finding that despite Plaintiff's ongoing complaints, her treatment consisted of and remained Botox and medication adjustments" and that it was proper for an ALJ to consider "inconsistencies between the severity of symptoms reported at the hearing and those reported while seeking treatment, the failure to regularly seek treatment for those symptoms, and/or the pursuit of 'routine and conservative' treatment." [*Id.* at 18-19.] Finally, as to the ALJ's reliance on a recent CT scan showing no cranial abnormalities, the Commissioner argues that this

was not error because the "ALJ did not doubt that Plaintiff experienced headaches. Rather, he did not find that the record showed Plaintiff's symptoms to be as limiting as she claimed." [*Id.* at 19.]

In reply, Chelsie acknowledges the deferential standard for disability appeals, but she argues that in this case, accepting the ALJ's credibility determinations would "simply rubber-stamp the Commissioner's decision without a critical review of the evidence." [Dkt. 14 at 1.] She reiterates that there are no well-accepted objective tests to determine the frequency and severity of migraines and faults the Commissioner for devising *post hoc* rationalizations for some of the ALJ's improper findings. [*Id.* at 3, 4-5.]

SSR 16-3p instructs the ALJ to apply a two-prong test to weigh the claimant's subjective symptoms. First, the ALJ "must consider whether there is an underlying medically determinable physical or mental impairment(s) that could reasonably be expected to produce the individual's symptoms, such as pain." SSR 16-3p, at *2; *see also* 20 CFR § 416.929. Second, if such an impairment is found, the ALJ must "evaluate the intensity and persistence of those symptoms to determine the extent to which the symptoms limit an individual's ability to perform work-related activities." *Id.* If there is a conflict between the plaintiff's description and the objective medical evidence presented, the ALJ must consider "other relevant evidence in the individual's case record" to resolve the conflict. SSR 16-3p, at *4; *Arnold v. Barnhart*, 473 F.3d 816, 823 (7th Cir. 2007).

An ALJ's subjective symptom evaluation is a credibility determination entitled to special deference and will be reversed only if patently wrong. *Burmester v. Berryhill*, 920 F.3d 507, 510 (7th Cir. 2019) (quoting *Curvin v. Colvin*, 778 F.3d 645, 651 (7th Cir. 2015)). "In determining credibility an ALJ must consider several factors, including the claimant's daily activities, her level of pain or symptoms, aggravating factors, medication, treatment, and limitations." *Villano*, 556 F.3d at 562 (citing 20 C.F.R. § 404.1529(c)).

7

Here, the ALJ recited SSR 16-3p's two-prong test and found that Chelsie satisfied the first prong of this test. [Dkt. 8-2 at 16-17.] He noted that Chelsie "has severe impairments that include migraine headaches[.] . . . [She] alleges she has 'extremely bad' migraines with associated nausea, dizziness, and vomiting occurring three to five times a week and lasting one to six hours, which require her to lie down in a dark and quiet room [and that] she sometimes passes out when she is dizzy, and that treatment with Botox injections (every three months), Eletriptan, Tylenol and Ibuprofen are not working." [*Id.* at 16-17.] He also considered a Headache Questionnaire in which Chelsie reported having severe migraines and Chiari headaches since 2017, and her husband's Third-Party Function Report attesting to her frequent headaches. [*Id.* at 17.] Based on this evidence, the ALJ found that Chelsie satisfied the first prong of SSR 16-3p's two-prong test. [*Id.*]

The ALJ found that Chelsie did not satisfy the second prong, however, because "the evidence suggests that her functioning is not as limited as she alleged." [*Id.* at 17.] In making this finding, he relied on the fact that she was still working in July 2020 despite already allegedly suffering from frequent and severe headaches; that a December 2020 treatment note indicated that Cymbalta had helped her headaches; that "[h]er compliance with medications was reportedly 76-100%, which suggested periodic treatment non-compliance and worsening symptoms"; that she had stopped her migraine injections because they were not helping; that "a recent CT [scan] was completely negative for an intracranial abnormality"; that "treatment for migraines remained medications and Botox therapy, which and were more effective than she alleged"; that she was able to help her sister plan her wedding in May 2022; that her "medical records failed to show a medical basis for her need to lie down as often as alleged (i.e., five days a week)"; and that she "also reported that she was able to perform her personal care independently and described a good range of activities of daily living." [*Id.* at 17-21.]

The Court finds that the ALJ made several errors in assessing Chelsie's credibility that require remand. Most troubling is his finding that Chelsie's medical records contradict her testimony regarding the frequency and severity of her migraines. At the hearing, Chelsie testified that by the time of her onset date in October 2020, she was having three to five migraines every week, that these migraines lasted between one and six hours, and that she could no longer keep working because she was "pretty much at [her] desk vomiting." [Dkt. 8-2 at 50-52.] She also testified that she experienced nausea, dizziness, vomiting, sensitivity to light and sound, and "searing pain through [her] entire head." [*Id.* at 52.] Chelsie's medical records are consistent with this testimony. [*See, e.g.*, dkt. 8-7 at 99-106 (October 2020 appointment describing daily headaches, dizziness, phonophobia, photophobia, vomiting, and pain equaling 10/10), 124-30 (February 2021 appointment describing daily headaches, pain equaling 10/10, photophobia, and phonophobia, and noting that "treatment provided no relief"), 38-40 (March 2021 appointment describing daily headaches, pain 9/10, "no improvement with pharmacotherapy"), 157-59 (May 2021 appointment stating that headaches are "only minimally better" with change in medication), 388-96 (June 2021 emergency room visit due to 2-day migraine), 159-61 (June 2021 appointment describing "[a]lmost daily headaches"), 424-26 (October 2021 appointment noting that "[o]ccipital nerve block by pain management did not help for head and neck pain"), 421-23 (January 2022 appointment noting almost daily migraines with "[o]ccipital and parietal pain that is moderate to severe and stabbing/throbbing/burning. Associated nausea, vomiting, photo and phonophobia").]

The Commissioner argues that the ALJ was reasonably suspicious of Cheslie's testimony because, while she claimed to have severe migraines, her treatment remained "routine and conservative." [Dkt. 13 at 19.] That argument is not supported by Chelsie's medical records. Chelsie was frequently driven by her mother on 4.5 hour-long trips to see neurologist Dr. Luzma

Cardona at the Cleveland Clinic, a journey that she described as "brutal." [Dkt. 8-2 at 58; *see generally* dkt. 8-7 (medical records).] Chelsie had a Chiari decompression surgery in 2017 and two follow-up repair surgeries; she has been prescribed numerous medications including Periactin, Emgality, Ajovy, baclofen, Flexeril, sumatriptan, eletriptan, prednisone, an occipital nerve blocker, and Topamax; and she has been prescribed quarterly Botox injections. [Dkt. 8-7 at 38-40, 99-106, 124-30, 157-61, 388-96, 421-26.] While some medications occasionally provided minimal improvement, Chelsie's neurologist frequently modified her treatment plan because, according to Chelsie's medical records, her condition did not improve significantly. [*Id.*] Chelsie's medical records simply do not support the Commissioner's characterization of her treatment as "conservative and routine" or the ALJ's conclusion that Chelsie "had adequate control of migraines with treatment, medications and injections." [Dkt. 8-2 at 21.]

The ALJ's claim that Chelsie was non-compliant with her prescribed medication and that her migraines may have been caused or aggravated by this non-compliance is also not supported by her medical records. Some of Chelsie's medical records from Reid Hospital included the following note: "Compliance with Medications: 76-100%." [*Id.* at 72, 117, 124, 132.] As Chelsie points out, these appear to be standardized treatment notes indicating that her medication compliance was in the range of 76% to 100%. Nothing in her medical records indicates that she voluntarily failed to take her medication as prescribed. At one point around March 2021, Chelsie "stopped Botox therapy after 2 cycles" because "she thought it was not helping." [*Id.* 39.] The Court is not convinced that choosing to discontinue quarterly Botox injections when those injections apparently provided no relief is the same thing as failing to take prescribed medication as directed. Even so, while "a history of sporadic treatment or the failure to follow a treatment plan can undermine a claimant's credibility, an ALJ must first explore the claimant's reasons for

10

the lack of medical care before drawing a negative inference." *Shauger v. Astrue*, 675 F.3d 690, 696 (7th Cir. 2012) (remanding where the ALJ failed to question the claimant about gaps in treatment); *see also* SSR 16-3p, 2017 WL 5180304 at 10* (providing a non-exhaustive list of reasons why a claimant might refuse certain treatments, such as costs and side effects).  In this case, the ALJ did not ask Chelsie to explain why she chose to discontinue her quarterly Botox injections, and nothing in the record indicates that her migraines were caused or aggravated by her decision to discontinue Botox injections.  [*See generally* dkt. 8-2 at 47-67.]  Rather, the record clearly indicates that Botox was one of many medications and treatments that Chelsie had been prescribed, and her medical records as a whole reflect an overall commitment to and compliance with her treatment plan.  *See Denton v. Astrue*, 596 F.3d 419, 425 (7th Cir. 2010) ("An ALJ has the obligation to consider all relevant medical evidence and cannot simply cherry-pick facts that support a finding of non-disability while ignoring evidence that points to a disability finding.").  Thus, to the extent the ALJ made a negative inference about Chelsie's credibility based on her decision to discontinue Botox injections alone, that inference was improper.

The ALJ also erred by finding that a CT scan of Chelsie's head that "was completely negative for intracranial abnormality" weighed against her credibility with respect to the frequency and severity of her migraines.  [Dkt. 8-2 at 19.]  There is no medical opinion evidence that the frequency and severity of migraines can be assessed through this type of imaging.  Indeed, the Seventh Circuit has previously held that an ALJ erred by relying on neural imaging to discount a claimant's credibility with respect to chronic migraines:

> [T]he ALJ['s] reliance on Moon's "unremarkable" 2008 MRI as evidence that her migraines were not a significant problem is not supportable. No doctor ever suggested that the MRI evidence meant anything about Moon's migraines, and for good reason. Doctors use MRIs to rule out other possible causes of headache—such as a tumor—meaning that an unremarkable MRI is completely consistent with a migraine diagnosis. *See* "Migraines: Tests and Diagnosis," Mayo Clinic,

11

>http://www.mayoclinic.org/diseases-conditions/migraine-headache/basics/tests–diagnosis/con–20026358 (visited Aug. 13, 2014). This mistaken reading of the evidence illustrates why ALJs are required to rely on expert opinions instead of determining the significance of particular medical findings themselves.

*Moon v. Colvin*, 763 F.3d 718 (7th Cir. 2014); *see also Engstrand v. Colvin*, 788 F.3d 655, 660-61 (7th Cir. 2015) (ALJ's credibility finding with respect to the claimant's neuropathic pain was "patently wrong" because she was critical of the claimant's failure to undergo an EMG and made findings about test results that were not supported by expert opinion evidence); *Michelle L.M. v. Kijakazi*, 2023 WL 3835583 at *9 (S.D. Ind. June 6, 2023) (finding that the ALJ had "succumbed to the temptation to improperly 'play doctor' when interpreting the results of [claimant's] brain MRI" when judging the claimant's credibility with respect to allegedly disabling chronic migraines). Thus, it was improper for the ALJ to use Chelsie's normal CT scan as evidence contradicting her testimony about the frequency and severity of her migraines.

Finally, the ALJ erred by finding that Chelsie's pre-onset employment diminished her credibility. To be sure, "consideration of a claimant's work history is 'proper when the claimant has had essentially the same condition for decades, and remained able to work.'" *Hill v. Colvin*, 807 F.3d 862, 868 (7th Cir. 2015). But when, as here, the claimant sought disability benefits after her condition became more severe, such consideration is improper. *See id.* ("This logic is backward: a 'claimant with a good work record is entitled to substantial credibility when claiming an inability to work because of a disability.'"). In this case, the ALJ did not ask Chelsie at the hearing about the severity of her migraines in July 2020 or whether her migraines interfered with her ability to perform her work at that time. Records from Reid Hospital in September 2020 indicate that her migraines became worse between July 2020 and her onset date in October 2020. [Dkt. 8-7 at 87 (September 14, 2020: "The problem has been rapidly worsening"), 93 (September 17, 2020: "Due to increase in migraines and inability to work[, patient] is exhibiting increased

stress and depression").]  Even in July 2020, Chelsie's medical records show that her migraines were already interfering with her ability to work.  [*Id.* at 46 (July 15, 2020, emergency room visit: "She has gone to urgent care 2x, yesterday went to the ER, and has missed 2 days of work because of the severity of her headaches.").][4]

For all of these reasons, the Court finds that the ALJ's reasoning discrediting Chelsie's testimony with respect to the frequency, severity, and limiting effects of her migraines is patently flawed and requires that this case be reversed and remanded for a new hearing.

### B.  Other Issues Raised

Because the undersigned finds remand to be necessary on the grounds set forth above, she will not address Chelsie's other arguments in depth.  Chelsie may raise her other concerns on remand if she deems it appropriate to do so.

### IV. CONCLUSION

For the reasons stated above, the Magistrate Judge recommends that the District Judge **REVERSE** the Commissioner's decision denying Chelsie E. benefits and **REMAND** this matter for further proceedings pursuant to 42 U.S.C. § 405(g) (sentence 4).  Any objections to this Report and Recommendation must be filed in accordance with 28 U.S.C. § 636(b)(1) and Fed. R. Civ. P. 72(b).  The failure to file objections **within 14 days** after service will constitute a waiver of subsequent review absent a showing of good cause for that failure.  Counsel should not anticipate any extension of this deadline or any other related briefing deadlines.

**SO RECOMMENDED.**

---

[4] As to Chelsie's argument that the ALJ erred in considering her decision to decline counseling in December 2020, the Court notes that she was never prescribed counseling for her chronic migraines.  Instead, counseling was offered for her mood disorders.  The Court interprets the ALJ's reasoning on this point as relevant only to Chelsie's disability claims for her mood disorders, which are not the subject of this appeal.

Date: 12/19/2023

*Kellie M. Barr*
Kellie M. Barr
United States Magistrate Judge
Southern District of Indiana

Distribution:

Brian J. Alesia
Social Security Administration
brian.alesia@ssa.gov

Jay Hinsley
SSA-Ogc
jay.hinsley@ssa.gov

Julian Clifford Wierenga
UNITED STATES ATTORNEY'S OFFICE (Indianapolis)
julian.wierenga@usdoj.gov

Kirsten Elaine Wold
Hankey Marks & Crider
kwold@hankeylaw.com